IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

JANICE HUNTSMAN,            )
                                         )
               Plaintiff,       )
                                         )
           v.               )        Case No. 5:21-cv-06138-RK
                                       )
MMC CORP, D/B/A MMC       )
CONTRACTORS, INC.;         )
                                       )
              Defendant.   )

## ORDER

Before the Court is Defendant MMC Corp., d/b/a MMC Contractors, Inc.'s motion for summary judgment. (Doc. 36.) The motion is fully briefed. (Docs. 37, 40, 44.)[1] After careful consideration and for the reasons explained below, the motion is **GRANTED**.

I.    **Background**[2]

Plaintiff Janice Huntsman began her employment with Defendant MMC Corp. in 2004. From 2015 until her termination in December 2020, Plaintiff held the position of Senior Payroll Accountant. Plaintiff was approximately 58 years old when she was terminated.

As the Senior Payroll Accountant, Plaintiff provided payroll support for the more than 500 union employees across multiple states, including processing weekly payroll, completing union reports, verifying employment. From January 2019 to May 2021, Vickie Sparks supervised only female employees, including Plaintiff. The accounting department included ten women, several of whom were older than Plaintiff, and two men. Joyce Wohler, who was supervised by Ms.

---

[1] Defendant argues in its reply that Plaintiff's suggestions opposing summary judgment should be stricken or disregarded for failure to comply with Local Rule 7.0(d)'s page limitation. (Doc. 44 at 4.) In response, Plaintiff filed a belated motion for leave to exceed the page limitation as to her suggestions opposing summary judgment by approximately ten (10) pages. (Doc. 45.) In the interests of justice, because Defendant has had sufficient opportunity to respond to Plaintiff's arguments, and without a finding otherwise of undue prejudice, the Court **GRANTS** Plaintiff's motion for leave to file excess pages and will consider Plaintiff's suggestions in opposition as filed.

[2] Except where otherwise noted, these facts are taken from the parties' statements of uncontroverted material facts. The Court has omitted facts properly controverted, facts asserted that are immaterial to the resolution of the pending motion, facts asserted that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

Sparks and was designated to assume Plaintiff's position when Plaintiff retired, was over the age of 40 during the relevant time.

In March 2020, Plaintiff and others began working at home in response to the COVID-19 pandemic. MMC Corp. initiated a staged return for its employees to in-person work in May 2020. At her deposition, Plaintiff testified that she had a conversation with Ms. Sparks sometime in May 2020 after which Plaintiff understood that she would be allowed to work remotely until her planned retirement in December 2021. Nonetheless, Plaintiff returned to the office for in-person work on August 3, 2020.

Before working from home in response to COVID-19, Plaintiff had been assigned a private office space. Upon returning to the office in August 2020, however, Plaintiff was assigned a shared office space. Ms. Wohler (Plaintiff's designated replacement for when Plaintiff retired) was assigned the private office space that Plaintiff had previously occupied. Ms. Sparks testified at her deposition that Ms. Wohler was assigned the private space because Ms. Sparks "wanted to have [Ms. Wohler] next to me so I could train her to perform the payroll duties." (Doc. 37-2 at 4.) Plaintiff returned to working remotely a few weeks later between August 25, 2020, and August 31, 2020, to take care of her husband who was disabled and who had recently broken his ankle.

On September 2, 2020, Ms. Sparks and Erik Dahl counseled Plaintiff regarding her professionalism and demeanor in the workplace, including how Plaintiff voiced her concerns and fear about working in-person due to COVID-19. Two days later, on September 4, 2020, Plaintiff took leave pursuant to the Family and Medical Leave Act ("FMLA") for major depression, panic disorder, and severe anxiety.

Plaintiff was initially approved for a period of four weeks of FMLA leave, i.e., until approximately October 5, 2020, pending release by her physician. On October 5, Plaintiff notified Defendant's benefits manager and HR systems administrator, Joanna Wright, by email that Plaintiff had not been released from care and that her doctor was completing new FMLA paperwork. Ms. Wright received Plaintiff's new FMLA paperwork from Plaintiff's doctor, Dr. M.A. Mirza at White Oak Psychiatric Services, on October 7, 2020, indicating an estimated return date of November 18, 2020. The following day, Ms. Wright informed Plaintiff by email that her FMLA leave had been approved from "9/4-11/11/20, subject to an update and release from your doctor."

Approximately one month later, on November 3, 2020, Plaintiff notified Ms. Wright by email that she would "not be released by my Doctor to return to work at the end of my FMLA," and "will update you when I have more information." Ms. Wright responded by email less than an hour later requesting an update from Plaintiff's doctor regarding her continued leave "by 11/11/20 if possible."

Plaintiff's FMLA leave was exhausted on November 11, 2020. On the same day, Plaintiff and Ms. Wright exchanged several emails concerning the exhaustion of her FMLA leave, Dr. Mirza's prior indication that leave was necessary until approximately November 18, 2020, and Plaintiff's request for one more week of leave pending a doctor's appointment that was scheduled for November 17, 2020. On the evening of November 17, 2020, Ms. Wright emailed Plaintiff requesting an update from Plaintiff's scheduled doctor's visit. Plaintiff responded the following morning that, "Per my Doctor, I am unable to return to work at this time. I will need to be off work for another 4 to 6 weeks while receiving additional treatment." Shortly after receiving this email, Ms. Wright responded, asking for "an updated note from your doctor indicating your need for additional time off and the anticipated return date[.]" Plaintiff stated that she would request the information and "will get it to you as soon as I can."

On November 19, 2020, Ms. Wright emailed Plaintiff stating that a doctor's note had not yet been received and requesting that Plaintiff provide one that day. Plaintiff responded the next morning, November 20, 2020, indicating that she would "request this from one of the Doctors that I am currently seeing again today." When Ms. Wright requested a timeframe to expect the doctor's note, Plaintiff responded that she was not sure about a time but would follow up with one of her doctors. That same afternoon, Ms. Wright received an "accommodation letter" for Plaintiff from Arianna Williams, a licensed processional counselor. Ms. Wright informed Plaintiff by email that she had received the letter and requested that Plaintiff provide "information about your schedule for seeing your psychiatrist and therapist," and noted that Plaintiff's counselor had "suggested a note from Dr. M[irza] . . . may be appropriate." Plaintiff responded that she would "request a letter from Dr. Mirza and will get it to you."

On November 23, 2023, Ms. Wright emailed Plaintiff that her FMLA leave had finally exhausted on November 11, 2020, and that "since you have not returned to work, your group health benefits will now have to be offered through COBRA." [3] Ms. Wright informed Plaintiff that

_____

[3] "COBRA" refers to the Consolidated Omnibus Budget Reconciliation Act, a federal law that

"[w]hen you return to work, you can rejoin our group plan without any waiting period" and that coverage under COBRA "will backdate to November 12, 2020."

Ms. Wright testified that it is MMC Corp.'s "practice" that "[w]hen a person has not returned from leave, and . . . there's no date for them returning from leave, their FMLA is expired, they are put on [COBRA]" [*sic*]. (Doc. 37-10 at 4.) Plaintiff attests that, as a payroll accountant, she is aware of one male employee, Dave Andrews, who "had exhausted FMLA leave and was not required to be converted to COBRA health insurance; other employees would donate their PTO time to him so he could continue to carry the benefits, and even when he was in the hospital." (Doc. 40-13 at 2, ¶ 9.) Plaintiff ultimately continued her health insurance through COBRA.

On December 1, 2020, Ms. Wright emailed Plaintiff indicating that she had not received the additional information that had been requested from Dr. Mirza and Plaintiff's counselor, Ms. Williams. Ms. Wright explained that "we need this information to evaluate your request for extended leave" and concluded: "It is very important we receive this information no later than 3:00pm on Friday, December 4 or we will accept this as having resigned your employment with MMC Contractors." Approximately one hour later, Plaintiff responded that she would "follow up with [Ms. Williams] during my appointment tomorrow morning," "forward this form to Dr. Mirza's office today," and would follow up with Dr. Mirza "at my Thursday appointment." Plaintiff also indicated that she did not intend to resign her position.

The morning of December 4, 2020, Plaintiff sent an email to Ms. Wright requesting that she "confirm that you have received the requested information from [Ms. Williams] . . . this morning," and also that "I have requested the form also be completed by Dr. Mirza and hoping it is sent to you today as well." Plaintiff again indicated that she did not intend to resign. Ms. Wright responded that she had received the updated information from Ms. Williams and that she would "watch for the info from Dr. Mirza."

On December 7, 2020, Ms. Wright informed Plaintiff that she had not received an update from Dr. Mirza. Plaintiff responded that she would "reach out to his office again to see if they can provide something to you regarding my ongoing treatment." Ms. Wright emailed Plaintiff later that afternoon to confirm Ms. Williams' request that Plaintiff be off work until December 26, 2020,

---

allows certain employees the right to choose to continue group health benefits provided by a group health plan for limited periods of time and under certain circumstances. *See also* FAQs on COBRA Continuation Health Coverage for Workers, U.S. Dept. of Labor, Employee Benefits Security Administration, *available at* https://tinyurl.com/2xwyekrc (last visited Feb. 22, 2023).

and that Plaintiff was requesting to "work from home after that for a period of time" as an accommodation. Ms. Wright also noted: "Information from Dr. Mirza about the time up until 12/26 is helpful to fully evaluate your leave needs, especially if he thinks you can work Tues & Thurs [*sic*] when not in treatment. That's what we are trying to confirm for certain." Plaintiff responded as follows:

> Just an FYI, I meet with my individual therapist on the days I am not in group and I meet with Dr. Mirza about every 10 days. Due to insurance limitations, I can only talk with one Doctor per day.

After Ms. Wright again asked for confirmation of the current requests for time off from work and accommodations, Plaintiff responded that it was her "understanding that I would need to be off through December 31 and an accommodation to work from home after that, for a period of time." Ms. Wright responded that Ms. Williams had requested leave until December 26, and that that request would be "sen[t] out to you and your supervisor," with Ms. Williams copied on the email. Plaintiff responded that "the December 31 date was given to me by Dr. Mirza and I have reached out to his office (and will call them again tomorrow) to confirm this date."

The next day, December 8, 2020, Ms. Wright again emailed Plaintiff reiterating that she had not received a reply from Dr. Mirza. A few hours later, Ms. Wright received a fax from Dr. Mirza with a Medical Provider Report for the Americans with Disabilities Act ("ADA"), indicating an anticipated healing period of 3-4 months.

On December 9, 2020, Ms. Wright received an email from White Oak Psychiatric indicating that "per Dr. Mirza" "the effective date for [Plaintiff] to return to work" was March 8, 2021. Ms. Wright responded by email inquiring whether "this include[s] working from home," explaining that: "[Plaintiff] indicated she could start working from home after 12/31. But her therapist Arianne Williams said 12/26 so we need guidance on that. Does the 3/8/21 date refer to when [Plaintiff] can return to the office?" [*sic*] Ms. Wright sent a follow-up email to White Oak Psychiatric the following morning, December 10, 2020, asking for information regarding "when [Plaintiff] can start working from home and when she can return to the office environment."

On December 11, 2020, Ms. Wright called White Oak Psychiatric and was told she would receive a reply by the end of the day; Ms. Wright did not receive any follow up, however. The same day, Ms. Wright emailed Plaintiff regarding the March 8 return date as indicated by Dr. Mirza; Plaintiff responded that she had not seen the forms but would follow up with Dr. Mirza

regarding "the timeline for my ongoing care" at an appointment scheduled for December 17. Ms. Wright responded:

> [Ms. Huntsman] without proper information we cannot approve your request for leave. [Ms. Williams] says 12/26, you say 12/31 and and [*sic*] Dr. Mirza says 3/8. Please call the office this morning and ask what was said and insist they reply to my email with clarification or this will affect your continued employment.

Four days later, on December 15, 2020, Ms. Wright sent a follow-up email stating that she had not received a response from either Plaintiff or Dr. Mirza:

> We must have a definitive answer regarding your leave status and ability to return to work, including the date you may begin working from home and the date you can return to the office so that we may review the request. We must have this information by noon on December 18, 2020 or we will be unable to continue your employment.

Plaintiff responded shortly thereafter, indicating that Ms. Wright should expect updated information from Ms. Williams and that she (Plaintiff) would reach out to Dr. Mirza's office again; Plaintiff further indicated that she had been told that all the required forms had been returned. Ms. Wright responded, highlighting the conflicting and unclear return dates, and reiterating that "I need to know the date you can return to work from home and the date you can return to the office by noon on Friday, December 18."

Two days later, on December 17, 2020, Plaintiff emailed Ms. Wright:

> You should be receiving updated information from Dr. Mirza. Based on my conversation with him (and [Ms. Williams]), I should be able to return to work from home on January 4 and possible [*sic*] return to the office after March 8. I hope this is the clarification you were looking for.

Ms. Wright responded a few hours later that she had not received an update from Dr. Mirza, "but will watch for it by tomorrow." Plaintiff confirmed that Dr. Mirza would respond by fax and that they had the correct fax number.

On the morning of December 18, 2020, Ms. Wright received a letter from Ms. Williams extending Plaintiff's discharge date from December 25, 2020 to January 1, 2020. In addition, Plaintiff responded to Ms. Wright's earlier email and indicated that she would "call [Dr. Mirza's office] again this morning and ask them to send you the information." At 4:15 pm on December 18, Ms. Wright emailed Plaintiff that she had not "receive[d] an update from Dr. Mirza. There has been no fax."

On the morning of December 21, 2020, Ms. Wright informed Plaintiff by email that she "still ha[s] not received any information from Dr. Mirza," and indicated that she "must receive

6

information from Dr. Mirza by end of business today . . . confirming [Plaintiff's] ability to work from home starting on January 4, 2021." The email stated that if the requested information was not received, "we will conclude that the interactive dialogue has failed and will proceed with processing your termination from employment." Plaintiff responded that she would "call them again this morning and ask them to send information to you." At approximately 6:45 pm, Ms. Wright sent the following email to Plaintiff:

> As of 6:30 this evening, I still have not received nothing [*sic*] from Dr. Mirza. As I previously explained, we have been seeking information about when/if you can return to working from home for well over a month. We have provided you and your health care providers multiple opportunities to provide this information and clarify the conflicting information. The accounting team needs someone to perform your role and the uncertainty around when and if you will resume your duties is untenable.

> Accordingly, we believe the ongoing failure to provide the information requested has resulted in a break down of the interactive dialogue. We are terminating your employment effective today, December 21, 2020, so the team can begin its search for someone to perform your job duties.

Plaintiff filed a charge of discrimination based on sex and disability with the Equal Employment Opportunity Commission on March 16, 2021, for which she received a Notice of Right to Sue on August 17, 2021. (Docs. 3-1, 3-2.)

Further facts are set forth as necessary.

## II.    Legal Standard

"Summary judgment is required if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "In considering a motion for summary judgment, the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) (citation omitted). Instead, the Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co.*, 893 F.3d at 1102 (citation and quotation marks omitted).

A party may be entitled to summary judgment if the opposing party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Hodge ex rel. Farrow v. Walgreen Co.*, 37 F.4th 461, 464 (8th Cir. 2022) (quoting *Celotex Corp. v.*

7

*Catrett*, 477 U.S. 317, 322 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted). In other words, while the summary judgment "movant has the burden of showing that there is no genuine issue of fact, . . . the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Hodge*, 37 F.4th at 464 (citation and quotation marks omitted). Once a summary judgment movant has satisfied his or her burden, the non-movant must point to some "affirmative evidence, specific facts, showing that there is a genuine dispute" as to a material fact. *Id.* (citation and quotation marks omitted).

## III. Discussion

Plaintiff asserts five claims: Count I – sex/gender discrimination in violation of Title VII of the Civil Rights Act of 1964; Count II – age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); Count III – unlawful retaliation in violation of the FMLA; Count IV – disability discrimination and harassment in violation of the ADA; and Count V – associational discrimination in violation of the ADA. Defendant seeks summary judgment as to each claim. The Court addresses each claim and the parties' arguments in turn, below.

### A. Rule 56(c)

Before reaching the merits, Defendant argues that Plaintiff failed to comply with Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 56.1(c) in her summary judgment brief. (Doc. 44 at 5.) Specifically, Defendant argues – and the Court agrees – that throughout the substantive portions of her brief opposing summary judgment, Plaintiff refers to facts that are unsupported by (or are inaccurate as to) the parties' statements of material facts. Rule 56(c) requires that a party must "cit[e] to particular parts of materials in the record" to support an assertion of fact at summary judgment. Moreover Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or issue any other appropriate order." Rule 56(e)(3)-(4). For purposes of ruling on Defendant's motion for summary judgment, the Court need not consider any unsupported factual assertions contained in the argument section of Plaintiff's opposition brief for which Plaintiff failed to include, reference, and provide an appropriate citation to the record in responding to Defendant's statement of material facts or in her own statement of material facts. *See Johnson Trustee of*

*Operating Eng'rs Local #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 523-24 & 524 n.1 (8th Cir. 2020) (holding district court did not abuse its discretion in considering plaintiffs' arguments only to the extent they cited to the summary judgment record with particularity). However, because the Court prefers to resolve legal issues on the merits and not on procedural missteps, the Court analyzes the matter on its merits and likewise concludes that Defendant is entitled to judgment as a matter of law notwithstanding the procedural errors.

## B. Count I – Title VII sex/gender discrimination claim

In Count I, Plaintiff first alleges that Defendant discriminated against her and "treated Plaintiff and other females less favorably than their male . . . counterparts" in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, involving the revocation of her work-from-home status, re-assigning Plaintiff to a shared work space (rather than private office) upon returning to in-person work, and ultimately terminating Plaintiff after she exhausted her FMLA leave.

Title 42 U.S.C. § 2000e-2(a)(1) makes it unlawful for an employer to discriminate against an employee because of his or her sex. A Title VII claim for sex/gender discrimination survives summary judgment if an employee (1) "produce[s] direct evidence of discrimination that demonstrates a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action," or (2) satisfies the *"McDonnell Douglas*[4] burden-shifting framework to establish an inference of unlawful discrimination." *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 907 (8th Cir. 2006) (citations and quotation marks omitted).

### 1. Direct evidence of unlawful sex/gender discrimination

Plaintiff first argues that she has presented direct evidence of sex/gender discrimination sufficient to survive summary judgment. In the employment-discrimination context, "direct evidence of discrimination" means "evidence that clearly points to the presence of an illegal motive." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). In *Griffith*, for instance, the Eighth Circuit found that the plaintiff did not present "direct evidence of discrimination" despite co-worker testimony recounting insensitive remarks about African-Americans and female employees without any evidence that the ultimate decisionmaker made similar insensitive remarks concerning the plaintiff's Hispanic background. *Id.* In other words, the Court found that "the

---

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

9

requisite causal link between remarks reflecting gender bias and actions taken against [plaintiff] is lacking." *Id.* (citing *Simmons v. Oce-USA, Inc.*, 174 F.3d 913, 915-16 (8th Cir. 1999)).

Here, Plaintiff argues that "all facts taken in the light most favorable to Plaintiff establish that a female accounting co-worker, Anna Battle, was terminated during her cancer treatments while male co-workers, including Gary Krabiel and Dave Andrews, were permitted to stay employed throughout a lengthy course of cancer treatments and after the exhaustion of FMLA leave." (Doc. 40 at 35-36.) These facts are not found within the parties' statements of material facts nor are they accompanied by any citation to the summary judgment record; they thus may not properly be relied on by Plaintiff to oppose Defendant's motion for summary judgment. *See* § III.A., above.

Even if these facts were properly before the Court at summary judgment, they do not provide direct evidence of discrimination to withstand summary judgment. Rather, these facts supporting a disparate treatment argument under the inference-of-discrimination framework under *McDonnell Douglas.* *See Takele v. Mayo Clinic*, 576 F.3d 834, 838 (8th Cir. 2009) (recognizing that a plaintiff may establish an inference of discrimination under the *McDonnell Douglas* framework "by producing facts that similarly situated employees, not in the protected class, were treated differently"); *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000). In other words, that another female co-worker (in addition to Plaintiff) was terminated while male co-workers were permitted to stay throughout the course of lengthy medical treatment does not provide clear evidence of illegal motive by a decisionmaker in the adverse action that *Plaintiff* herself alleges occurred against her. *See Wade v. Sandord Med. Ctr.*, No. 3:16-CV-03034-RAL, 2018 WL 3825904, at *9 (D.S.D. Aug. 10, 2018) (holding evidence *inter alia* of younger employees being treated more favorably than plaintiff did not constitute direct evidence of age discrimination "because a fact finder would be required to *infer* from this evidence that age was the motivating factor behind [plaintiff]'s termination").

## 2. *McDonnell Douglas* **inference of discrimination**

Without direct evidence of unlawful discrimination, Plaintiff "bears the initial burden of making out a prima facie case of discrimination" under *McDonnell Douglas.* *Elnashar v. Speedway SuperAm., LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007) (citing *McDonnell*, 411 U.S. at 802).

To establish a prima facie case, the plaintiff must show that: (1) [she] belonged to a protected group; (2) [she] was qualified for the position in question; (3) [she] was

subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.

*Id.* (citation omitted). Once a plaintiff has done so, "the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its action." *Id.* (citation omitted). "If the defendant satisfies its burden [to demonstrate a legitimate, nondiscriminatory reason for the action it took], then the plaintiff must show that the nondiscriminatory reason was a pretext for discrimination." *Id.* (citation omitted).

Defendant first argues that Plaintiff cannot establish a prima facie case of sex discrimination. Defendant argues (and Plaintiff provides no argument to the contrary) that being required to return to work in person and her reassignment to a shared workspace are not adverse employment actions that give rise to a Title VII employment-discrimination claim. *See Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013) (explaining that an adverse action means "a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to constructive discharge"). Plaintiff does not argue the conditions that she return to in-person work or reassignment to a shared workspace amounted to constructive discharge. Of course, termination is an adverse employment action. *See id.* The next question, then, is whether Plaintiff was terminated under circumstances giving rise to an inference of discrimination, the fourth factor of the *McDonnell Douglas* framework.

In *Lake v. Yellow Transportation, Inc.*, 596 F.3d 871 (8th Cir. 2010), the Court recognized that a plaintiff may show both an inference of discrimination and pretext "by showing that an employer (1) failed to follow its own policies, (2) treated similarly situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Id.* at 874-75 (citations omitted). To demonstrate that similarly situated employees were treated differently under *McDonnell Douglas*, a plaintiff "must show the employees were similarly situated in all relevant respects." *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) (citations and quotation marks omitted). In this vein, to show similarly situated employees were treated differently than her, Plaintiff asserts that "Male employees at MMC were not terminated when

11

their FMLA leave was exhausted, yet Plaintiff and her co-worker, Anna Battle, were." (Doc. 40 at 37.)[5]

As noted above, "to establish a prima facie case based on differential treatment, a plaintiff must show that she and the more leniently treated employees were similarly situated in all relevant respects." *Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1063 (8th Cir. 2020) (citation and quotation marks omitted). This is a high burden. *See EEOC v. Kohler Co.*, 335 F.3d 766, 776 (8th Cir. 2003) (to meet the "rigorous" similarity test for purposes of discrimination claims, the plaintiff must set forth evidence "that there were individuals similarly situated in all relevant aspects to her by a preponderance of the evidence" and that the other individual were treated differently than the plaintiff) (citations and quotation marks omitted).

Here, at most, the only assertion Plaintiff makes in her argument is that at least one male co-worker undergoing cancer treatment was not terminated after having exhausted FMLA leave whereas Plaintiff was terminated after having exhausted her FMLA leave. This is not sufficient to sustain Plaintiff's burden to demonstrate that that male co-worker was similarly situated in all relevant respects to Plaintiff, however. *See Said v. Mayo Clinic*, 44 F.4th 1142, 1148 (8th Cir. 2022) (plaintiff must "offer specific, tangible evidence of at least one other employee who was similarly situated in all relevant respects, including committing offenses of the same or comparable seriousness to [plaintiff]'s, who received disparate treatment compared to [plaintiff]") (citations and quotation marks omitted). The necessary relevant respects in this case would at least include the circumstances surrounding the exhaustion of FMLA leave (including the opportunity or communication as to donated PTO time), and the communication and information exchange between the employee, the employer (Defendant), and the employee's healthcare professionals for continued leave and possible accommodations for continued employment (including the timeliness, completeness, and consistency of those communications).

Plaintiff has not presented the necessary evidence at summary judgment to sustain her burden of demonstrating a prima facie case of discrimination. In short, the summary judgment record before the Court does not include any facts on which Plaintiff could rely that the referenced

---

[5] The Court again emphasizes that these facts are not properly before the Court for summary judgment. *See* § III.A, above. Nonetheless, for sake of argument, the Court presumes these facts are properly before the Court on summary judgment.

male employees were similarly situated to Plaintiff in such a manner that would support an inference of discrimination in Plaintiffs' termination.

Accordingly, Defendant is entitled to summary judgment as to Count I based not only on Plaintiff's procedural missteps but also on the merits.

## C. Count II – ADEA age discrimination claim

In Count II, Plaintiff claims that she was treated less favorably than younger employees and asserts a claim for age discrimination in violation of the ADEA, 29 U.S.C. § 621 *et seq.* Plaintiff alleges she was treated less favorably than younger employees and that she was discriminated against based on her age to the extent Defendant revoked her previously agreed-to work-from-home status, reassigned her to a shared workspace, and terminated her employment.

Title 29 U.S.C. § 623(a)(1) makes unlawful any discrimination within the employment relationship "because of" an employee's age. To sustain a claim of age discrimination under the ADEA, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009); *accord Hilde v. City of Eveleth*, 777 F.3d 998, 1003 (8th Cir. 2015). Stated differently, a plaintiff must show that "age actually motivated the employer's decision"; in other words, the plaintiff must show that "the employee's age actually played a role in the employer's decision[-]making process and had a determinative influence on the outcome." *U.S. EEOC v. City of Independence, MO*, 471 F.3d 891, 894 (8th Cir. 2006) (cleaned up). To establish a prima facie case of age discrimination, Plaintiff must show: "(1) she is over 40; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) substantially younger, similarly situated employees were treated more favorably." *Faulkner v. Douglas Cnty. Neb.*, 906 F.3d 728, 734 (8th Cir. 2018) (citations omitted).

To demonstrate a prima facie case, Plaintiff primarily relies on the fact that the individual she was replaced with after being terminated (Ms. Wohler) is two years younger than Plaintiff. A gap of two years in age between a plaintiff and her replacement does not by itself support a reasonable inference of age discrimination. In *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149 (8th Cir. 2007), the Court held that a "five-year difference is not sufficient" to raise an inference of age discrimination because the replacement employee "clearly was not sufficiently younger." *Id.* at 1154; *see Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1136 (recognizing that a prima facie case of age discrimination requires a showing that a plaintiff's replacement "was significantly

13

younger"; holding that plaintiff "failed to establish a prima facie case of age discrimination since his permanent replacement was only two-and-a-half years younger than he"); *Hillesheim v. Wells Fargo Bank, N.A.*, No. 20-cv-0533 (WMW/HB), 2021 WL 4173167, at *4 (D. Minn. Sept. 4, 2021) (holding five-year age gap would not raise inference of age discrimination); *Hart v. Opaa! Food Mgmt., Inc.*, 244 F. Supp. 3d 969, 978-79 (W.D. Mo. 2017) (holding nine-year age difference "is too small to show that [plaintiff] was replaced by a 'substantially younger' employee" and thus failed to establish a prima facie case of age discrimination).

Indeed, none of the out-of-circuit cases Plaintiff herself cites found a minimal two-year age difference adequately raised any inference of discrimination. *See, e.g.*, *Rudenborg v. Di Giorgio Corp.*, No. 08-5791 (KSH), 2011 WL 4594220, at *5 (D.N.J., Sept. 30, 2011) (finding three-year age gap sufficient to raise an inference of discrimination). Finally, even if it did, an age gap alone "though necessary to establish prima facie case, possesses insufficient probative value to persuade a reasonable jury that plaintiff was discriminated against." *Carraher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007) (citation and quotation marks omitted). Plaintiff otherwise has failed to provide evidence that she was discriminated against based on her age.[6] Defendant is therefore entitled to judgment as a matter of law as to Count II.

---

[6]In her brief, Plaintiff asserts that as a payroll accountant she "was aware of several older women being laid off in March of 2020" who were either replaced by or whose job duties were split among much younger employees, including one employee "age 60s" who was replaced by a younger individual "age 30s." Plaintiff also asserts that she "is aware of at least one older female . . . who was not provided training on new computer equipment but younger women were, and the lack of training was held against the older female[] resulting in termination." These assertions violate Rule 56(c), however, because Plaintiff fails to provide any supporting citation for these assertions in the summary judgment record.

Even if the Court were to consider these assertions, it still would not be enough to satisfy Plaintiff's burden to demonstrate a prima facie case of age discrimination, however. Only one of the assertions suggests itself an inference of age discrimination to the extent the terminated employee was replaced by an employee 30 years younger. Nonetheless, "[t]he ultimate question is whether the employer intentionally discriminated," and therefore *Plaintiff's* "age must have been the factor that made a difference as to whether or not she was terminated" or suffered any other adverse employment action. *Canning v. Creighton Univ.*, 995 F.3d 603, 612 (8th Cir. 2021) (citations and quotation marks omitted). Even if these facts were properly raised in summary judgment, they would not give rise to an inference that *Plaintiff* was discriminated against because of her age to withstand summary judgment. *See Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1035-36 (8th Cir. 2016) (finding "me too" failed to raise genuine question of material fact to avoid summary judgment where plaintiff did not demonstrate similarities between how the comparator was treated other than that they both received written warnings from the same individual). This "similarly situated coworker inquiry" "requires proof that the other employees were similarly situated in all relevant respects." *Canning*, 995 F.3d at 613-14 (citation and quotation marks omitted). The value of this type of evidence "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).

### D. Count III – FMLA retaliation claim

In Count III, Plaintiff alleges that Defendant unlawfully retaliated against her for exercising her rights under the FMLA by terminating her health insurance benefits and her employment.

The FMLA prohibits discrimination by an employer against an employee for the employee exercising her rights to leave under the FMLA. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006). "Basing an adverse employment action on an employee's use of [FMLA] leave" constitutes an unlawful action under the FMLA. *Id.* (citation and quotation marks omitted). To establish a prima facie claim for FMLA retaliation, a plaintiff must "show that she exercised her rights afforded by the [FMLA], that she suffered an adverse employment action, and that there was a causal connection between her exercise of rights and the adverse employment action." *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008) (citation and quotation marks omitted). If the plaintiff does so, "the burden shifts to [the defendant] to come forward with evidence of a legitimate, nondiscriminatory reason for the adverse action," after which the plaintiff "must come forward with evidence that creates an issue of fact as to whether the asserted reason was pretext for discrimination." *Id.* (citations omitted). A plaintiff may demonstrate pretext by showing that "similarly situated employees who did not engage in the protected activity were treated more leniently." *Id.* (citation and quotation marks omitted).

Defendant argues that Plaintiff cannot demonstrate a prima facie case for FMLA retaliation because she fails to demonstrate a causal connection between any adverse action and her request for FMLA leave. "To establish a causal link between the employee's exercise of FMLA rights and her termination, the employee must prove that an employer's retaliatory motive played a part in the adverse employment action." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (citation and quotation marks omitted). The requisite causal link may be established by temporal proximity (although "[t]he mere coincidence of timing . . . is rarely sufficient to establish the causation element"); "evidence of the employer's discriminatory comments," including comments by others on which the ultimate decisionmaker relies in deciding to terminate an employee, for instance; or evidence of "escalating adverse and retaliatory action" against an employee after she takes FMLA leave. *Id.* at 866 (citations and quotation marks omitted).

---

There is no evidence that Plaintiff's circumstances were similar to those of the other older individuals to whom Plaintiff refers; no evidence of the circumstances leading to the termination of their employment, including any reason given for their being "laid off"; and no evidence of the identity of the decisionmaker as to the other employees' termination.

Here, the temporal connection – three months between when Plaintiff first took FMLA leave on September 4, 2020, and her termination on December 21, 2020 – is not sufficient on its own to raise any inference of retaliatory motive to survive summary judgment. *See Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (recognizing that "[a]lthough we have not drawn a definitive line, we have determined that a one-month or two-month lag is too long absent other evidence" for "temporal proximity . . . to establish the causal connection without other evidence of discriminatory animus"). Moreover, it is undisputed that Defendant's "practice" is that "[w]hen a person has not returned from leave, and there is no . . . date for them returning from leave, their FMLA leave is exhausted, they are put on COBRA." Plaintiff does not dispute that this is Defendant's practice, but appears to argue that Defendant did not follow this practice when it allowed a male employee who had exhausted his FMLA leave to continue to carry benefits while co-employees donated their "PTO time" to him.

Even assuming Plaintiff's placement on COBRA insurance upon exhausting her FMLA leave is an "adverse action," Plaintiff fails to supply any evidence of retaliatory motive against her in doing so. That another employee was allowed to continue to carry benefits by other employees donating their PTO time, despite having exhausted his own FMLA leave, does not give rise to any inference of retaliatory motive when it comes to the undisputed policy being applied to Plaintiff. Plaintiff cites no caselaw and makes no substantive argument to the contrary.[7]

Finally, Plaintiff's reliance on the "interactive process in the interim" does not provide the necessary evidence of retaliatory motives, either. Nothing in the extensive communications between the parties suggests that Plaintiff was terminated in retaliation for exercising her right to take FMLA leave. Rather, Defendant requested documentation from Plaintiff's treating professionals numerous times, which were not provided in a timely manner. Plaintiff points to no evidence in the summary judgment record that would support a reasonable inference that her

---

[7] Further undercutting this claim, Plaintiff acknowledges in her brief that "Plaintiff was advised by Joanna Wright that . . . 'when [she] return[ed] to work,' she could 'rejoin [the] group plan without any waiting period.'" (Doc. 40 at 48-49.) This suggests that her placement on COBRA insurance after having exhausted her FMLA leave and having not returned to work – which Plaintiff does not dispute either – was not retaliation for exercising her FMLA leave. Rather, allowing Plaintiff the opportunity to continue on the same health plan through COBRA – which she accepted and was retroactive to November 11, 2020 – was the normal function of Defendant's policy and occurred in the normal course because she did not return to work after exhausting her FMLA leave.

16

termination was in retaliation for her exercising her rights to medical leave under the FMLA. Defendant is therefore entitled to judgment as a matter of law as to Count III.

### E. Count IV – ADA disability discrimination claim

In Count IV, Plaintiff asserts a claim under the Americans with Disabilities Act. "To obtain relief under the ADA, [Plaintiff] must show that [s]he (1) has a 'disability' within the meaning of the ADA, (2) is a 'qualified individual' under the ADA, and (3) suffered an adverse employment action as a result of the disability." *Fenney v. Dakota, Minn. & E. R. Co.*, 327 F.3d 707, 711 (8th Cir. 2003) (citation and quotation marks omitted). Both parties appear to agree that this claim turns on whether "Defendant failed to properly engage in the interactive process regarding Plaintiff's requested accommodations" (Doc. 40 at 47), or stated differently, whether Defendant "made a good faith effort" to engage with Plaintiff in the interactive accommodation process. (*Id.* at 52-53.)

"In order to determine whether an accommodation is necessary, and if so, what that accommodation may be, the employer and employee must engage in the 'interactive process.'" *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014) (citation omitted). To show that an employer failed to participate in the required interactive process, the employee must demonstrate:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Id.* (citation and quotation marks omitted). Plaintiff argues that a genuine question of material fact exists whether Defendant or Plaintiff was responsible for the breakdown in the interactive process.

Plaintiff concedes that "employers are entitled to request proper medical documentation from a treating physician to support . . . a plaintiff's accommodation request." (Doc. 40 at 52.) There is no dispute that Defendant properly requested this information from Plaintiff's treating providers, and that "Plaintiff tried to see that Defendant received documentation from her treating providers." There is similarly no dispute that despite repeated requests, Defendant did not receive the properly requested documentation and clarification from Plaintiff's treating providers regarding the accommodations Plaintiff needed, particularly as to when Plaintiff could return to work both remotely and in person. Plaintiff has failed to create a genuine question of fact whether

17

Defendant engaged in the interactive process in good faith. Further, there is nothing to suggest that Defendant engaged in the interactive process in bad faith.

In general, the burden falls on the employee to determine the appropriate accommodation and to provide information necessary to "identify the need for accommodations specific to her job and workplace." *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.2d 1212, 1218 (8th Cir. 1999). In *Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130 (7th Cir. 1996), the Court explained that "courts should look for signs of failure to participate [in the interactive process] in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Id.* at 1135. "A party that obstructs or delays the interactive process is not acting in good faith"; "[a] party that fails to communicate . . . .may also be acting in bad faith." *Id.* "Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process." *Id.*; *see Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812 (6th Cir. 2020) ("an employee's failure to provide requested medical documentation supporting an accommodation precludes a failure to accommodate claim").

In *Lundquist v. University of South Dakota Sanford School of Medicine*, No. 09-4147-RAL, 2011 WL 5326074 (D.S.D. Nov. 4, 2011), the district court relied on *Beck* to hold that the plaintiff was "preclude[d] . . . from claiming that [her employer] violated the ADA by failing to provide the requested accommodation" because it was plaintiff's own failure to complete the required registration forms (which included a release of information) and medical documentation necessary for the employer to consider the accommodation request. *Id.* at *8-9. Similarly, in *Matthews v. Bank of America*, No. 4:10CV1097 JAR, 2011 WL 6884795 (E.D. Mo. Dec. 29, 2011), the district court held that the defendant-employer was entitled to summary judgment and as a matter of law was not liable for failure to accommodate because "the breakdown in the interactive process occurred when Plaintiff failed to provide her medical documentation to support her request for leave." *Id.* at *6 (citing *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998); *Templeton v. Neodata Servs.*, 162 F.3d 617, 619 (10th Cir. 1998)). In *Matthews*, the district court rejected the plaintiff's argument that it was ultimately her doctor's failure to complete the required forms rather than her own: "Defendant, however, is not responsible for a breakdown in communication with Plaintiff's doctor." *Id.* (citation omitted).

18

Here, rather than Defendant's "refus[al] to accept what Plaintiff's providers were saying about their expectations as to Plaintiff's return date," the undisputed facts show that Defendant received conflicting information from Plaintiff and her treating professionals and attempted to determine the scope and contours of Plaintiff's requested accommodations, including extended leave and at least initially returning to work remotely rather than in-person. For instance, after Ms. Williams indicated that Plaintiff would need off until December 26 (after which she indicated that Plaintiff could work remotely), Plaintiff indicated herself that she would need off until December 31. Then, Dr. Mirza indicated that Plaintiff could return to work on March 8, 2021, after which Defendant was unable to clarify when Plaintiff could return to work both remotely (if earlier than March 8) and then when she could return in person (if at or after March 8). Plaintiff then indicated that, per her treating professionals, that she could return to remote work on January 4, 2021, and potentially return to in-person work after March 8. Defendant continued to request clarification from Dr. Mirza "confirming [Plaintiff's] ability to return to work from home starting January 4, 2021"; Defendant never received the documentation. Under these circumstances, it is undisputed that there was a breakdown in the interactive process. Plaintiff has failed to raise a genuine question of fact whether Defendant acted in bad faith, and the undisputed material facts show instead that Defendant acted in good faith in the interactive accommodation process, and that it was Plaintiff's failure to provide the requested treatment information (which Plaintiff concedes Defendant could properly request) that triggered the breakdown.

A final aspect of Plaintiff's argument is that a genuine issue of material fact exists as to whether Defendant engaged in the interactive process in good faith exists because "Defendant made no attempt to allow Plaintiff to return to work, from home, on December 26 or December 31, 2020." This argument puts the cart before the horse, however. This argument presumes that Plaintiff in fact had a "return date" as part of her accommodation under the ADA. But the issue here is not the contours or application of an appropriate accommodation for Plaintiff's disability, but rather the antecedent process of determining what accommodation would be applied. The undisputed facts indicate that Plaintiff's failure to provide the requested information hampered the interactive process such that the parties were unable to resolve the initial question of what accommodation could or would be appropriate. Plaintiff's argument thus is without merit as the undisputed facts show that Defendant is not liable for failing to accommodate Plaintiff's disability as a matter of law. Defendant is entitled to judgment as a matter of law as to Count IV.

### F. Count V – ADA associational discrimination claim

Finally, in Count V, Plaintiff asserts a claim for associational discrimination under the ADA based on both the "termination of her health insurance" in November 2020 and ultimately the termination of her employment in December 2020 as unlawfully "motivated by Plaintiff's association with her disabled husband." (Doc. 3 at 16, ¶¶ 110-11.) Defendant argues it is entitled to summary judgment because Plaintiff did not properly exhaust this claim.

To bring a claim under the ADA, a plaintiff must first file a complaint with the EEOC. *Sellers v. Deere & Co.*, 791 F.3d 938, 943 (8th Cir. 2015). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice and must be individually addressed before the EEOC." *Voss v. Housing Auth. of the City of Magnolia, Ark.*, 917 F.3d 618, 623 (8th Cir. 2019) (citation and quotation marks omitted). At the same time, "[a] plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or reasonably related to the substance of charges timely brought before the EEOC." *Lindeman v. Saint Luke's Hosp. of Kansas City*, 899 F.3d 603, 608 (8th Cir. 2018) (citation and quotation marks omitted.)

Plaintiff argues that because her charge of discrimination checked the box for "disability" discrimination and that the substantive portion refers to her husband being disabled, that her associational discrimination claim should be deemed exhausted. The critical question here is whether the associational discrimination claim asserted in Count V is "like or reasonably related to the administrative charge[]" Plaintiff brought, i.e., specifically asserting claims based on sex, disability, and age discrimination regarding return to in-person work, FMLA leave, the interactive accommodations process, and ultimately her termination. *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 944 (8th Cir. 2021) (citation and quotation marks omitted). As the Eighth Circuit explained in *Weatherly*: "The key is that the scope of a judicial complaint can be no broader than the scope of the EEOC investigation that could reasonably be expected to grow out of the charge in the EEOC complaint." *Id.* at 945 (citation and quotation marks omitted).

Although it is close, the Court is not persuaded that Plaintiff properly exhausted the associational discrimination claim she asserts here. Plaintiff did refer generally to her husband's disability in the body of her complaint, and she did check the box for "disability" discrimination. At the same time, however, nothing in the substance of her administrative charge or any allegation therein suggests any alleged action or adverse employment action was related in any way to her

husband's disability. The only reference to her husband's disability and the underlying circumstances is that he was at a high risk for complications should he contract COVID-19, contributing to Plaintiff's own disability as a result of COVID and fear about in-person work, etc.

Plaintiff indicated in her administrative charge only that she experienced discrimination "based on my disability status as well as my age and gender." In her brief, Plaintiff suggests that the administrative complaint could be liberally construed to imply she took FMLA leave in relation to her *husband*'s stated disability. The Court is not persuaded, however. The portion of Plaintiff's administrative charge to which Plaintiff refers in support of this argument includes (in full) as follows:

> On or about September 4, 2020 I was diagnosed with Major Depression, Panic Disorder and Severe Anxiety. A major factor causing these disabilities was the fact that I was forced to work in a shared office space when I had a husband who was considered high risk for COVID complications. ***As a result of the diagnosis of these disabilities, I took FMLA leave.*** During that time, I underwent intensive outpatient therapy, which was essentially all day, every weekday. I also continued to see a counselor and medical doctor.

(Doc. 3-1 at 1 (emphasis added).) Though the Court should "construe administrative charges liberally, [the Court] will not invent, *ex nihilo*, a claim that was not made before the relevant agency." *Weatherly*, 994 F.3d at 944 (citation omitted). The Court agrees with Defendant: Plaintiff failed to properly exhaust the claim for associational discrimination, and therefore Defendant is entitled to judgment as a matter of law as to Count V.

## IV. Conclusion

Therefore, Defendant's motion for summary judgment (Doc. 36) is **GRANTED**.

**IT IS SO ORDERED**.


s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT


DATED: February 23, 2023

21